Good morning. Please be seated. This is 4090600, In re the Marriage of, is it Tucker? Tuchardt? I apologize. And for the appellate, we have Sean Collins and Julie Anderson, and the appellee, Melissa McGrath. Who will be our users? Sean Collins. Okay, Mr. Collins. Good morning, and thank you for this opportunity. It's my proud privilege to be here on behalf of C.C. Tuchardt. May it please the Court. C.C. and Wally have two children, Catherine and Paula, as this panel is well aware. Before the trial court's entry of its order a little over a year ago, at all times throughout Catherine and Paula's lives, C.C. Tuchardt was their primary caregiver. As the record clearly demonstrates, I don't believe there's significant controversy about it. That role was taken away from her by dishonor of Judge Butler's order in October 2008. Respectfully, it was a mistake. There were two significant mistakes in the court's order on which that deprivation to C.C. was founded. It's those two things I want to bring to the Court's attention again in my statements here today. I urge the Court to give it careful consideration, which I know you will. This is about the most significant case I have ever argued, and I know you take this very, very seriously. At page five of the order of Judge Butler's that we challenge, the trial court begins its consideration, of course, of the nine factors. On page five, dishonor talks about the children's adjustment to home, school, and community. It says a couple of things which are very significant as a statement of the law, with which we do not agree. We think it's right on the money as a statement of the law. The Court says that an important consideration in determining custody under the best interest of the child standard is stability of the home, excuse me, stability of the environment, i.e., consideration of which parent has been caring for the child. The Court goes on to say it is proper for the Court to consider who has been the primary caretaker of the children during the marriage, including during periods of temporary custody. And now we get to the first mistake. As dishonor works through this factor, it is evident that C.C. is given no credit, or virtually no credit, for having been without question the children's primary caregiver throughout all of their lives prior to June of 2007. In June 2007, as this panel is aware, the parties entered an agreement for custody and for how the children would be parented while the divorce proceeding was pending. That was June of 2007. At that time, at that time, Catherine was nine years old. Paul was six years old. That means that it is unchallenged here that for the first nine years of Catherine's life, her primary caregiver was C.C. For the first six years of Paul's life, it is unchallenged that her primary caregiver was C.C. It is also unchallenged that during those years of Catherine and Paul's life, the children thrived, that C.C. was an excellent and attentive mother, that the arrangement between Wally and C.C. was that Wally would go off and be the breadwinner, C.C. would stay home and care for the kids. That was their understanding and agreement, and the children thrived. C.C. did the heavy lifting during that period of raising children, getting them up, getting them fed, getting them to school, dealing with the teachers, being at school, participating in their activities. At the end of the school day, bringing them home, arranging play dates with friends. I'm not for a moment during anything I say today going to denigrate Wally Tupac. That's not why I'm here. It's simply to recognize that during those first nine years of Catherine's life, the first six of Paul's life, undoubtedly C.C. Tupac was the primary caregiver, and it's quite apparent here that in Judge Butler's order, despite the judge's clearly accurate articulation of the legal standard, no credit was given to C.C. for her role as a primary caregiver during all of that time of the children's life. She should have been credited, was not. Respectfully, we suggest that was error. The other feature of error in this consideration by Judge Butler involves just a couple sentences down on page five. It carries over to page six. Judge Butler says, the children have done very well when primarily in petitioner's care, referring, of course, to Wally. Carrying over to the top of page six, the children have been thriving while primarily in petitioner's care since the parties separated. We have no quarrel. In fact, we completely agree with Judge Butler when the judge says that the children were thriving during this period of the parties' joint agreement. We agree with that completely. We think the record is very clear. The children have done very well. They were thriving. But the record is also clear as to who the primary caregiver was. Under the parties' joint parenting agreement, C.C. Tupac had the children from 7 o'clock in the morning until Wally got home each night, Monday through Friday. That's about 4.30. She had the children on alternate weekends, late in the afternoon on Friday until late in the afternoon on Sunday. She had the children on alternate Monday nights. When you work through the analysis of what that means and who was doing, once again, who was doing the heavy lifting of the parenting and getting the kids to school and dealing with all of the school issues, who was doing that during the school year? That was C.C. When we get to the summer, it's even more clear-cut. We're talking about from the time the children wake up until late in the afternoon every day during the summer, nine-and-a-half hours, day after day after day, Monday through Friday, it ceased. And I don't mean to denigrate Wally's love for his children. I don't. I wouldn't cast aspersions on that ever. But when we're talking about who was primarily caring for these children, not only in terms of the raw number of hours, Your Honors, well, no, that's not the only part of the analysis, but who was doing the work of the parenting. The most difficult responsibilities of the parenting, when you look at this joint parenting order and the other evidence in the case, it's clear the primary caregiver was C.C. The record is clear. And so when His Honor Judge Butler founds his decision, his custody decision, on the statement that Wally was the primary caregiver during that period, and therefore that justifies in the trial court's mind that Wally should be given sole custody, that's error. That's an erroneous factual premise for His Honor Judge Butler's order. C.C. was the primary caregiver. And so what that means is on the day these children were born and up until Judge Butler's entry of his order in October of 2008, throughout the entirety of young Catherine and young Paul's lives to that point, the primary caregiver was C.C. Undisputedly, this was a period of time during which C.C. not only loved these kids and cared for these kids and did the heavy lifting of parenting, but also, and most importantly, the children loved her. They wanted to be with her. Not, of course, to the exclusion of Wally. They loved their father, too. But they loved her. And they thrived under her care. However, she plainly took her responsibility seriously. There is no factual justification for the assertion that prior to October 2008, C.C. was not the primary caregiver. We allege that was error. It was against the manifest weight of the evidence. And it's one of the reasons, I'll get to the other in a minute, why we respectfully urge that this Court reverse this one. Now, the second error that we allege has to do with the consideration. It begins on page six. Well, actually, earlier than that, but let me explain. The mental and physical health of all involved. Now, His Honor Judge Butler begins this discussion really on page two. And the centerpiece of this, obviously, is C.C.'s bipolar disorder. We don't run from that. We're not afraid of that. This is a brave woman contending responsibly with a disorder that affects many, many hundreds of thousands of people in this country. I think the record is clear that she sought treatment. She was responsible in dealing with this. She understood her condition, and she took it seriously. His Honor Judge Butler's consideration of this issue begins on page two. That's where I'd like to begin. And near the bottom of page two, Judge Butler says, Despite the conflicting medical opinions, there is credible evidence that respondent's bipolar disorder has affected her ability to parent as late as 2007. There is no cure for this condition. Now, His Honor then goes on to say at page six, His Honor cites bipolar disorder as a reason why, ultimately, Wally should get sole custody of the children. But it all begins back at page two. But what His Honor says is error. There is credible evidence that respondent's bipolar disorder has affected her ability to parent as late as 2007. Self-evidently, when we're talking about bipolar disorder and how it affects someone's ability to parent, obviously, we need experts. We need doctors to tell us who have specifically talked to this patient, this parent, and to tell us, and to put in the record what is the truth as they see it, and what do we have. What we have is that the only person saying that her bipolar disorder negatively affected CeCe's ability to parent her children is Judge Butler himself. Wally Cide could not find a witness to say that. CeCe had two treaters come to trial and testify on this issue. Your Honors have seen the record. Dr. Avelita, a psychiatrist, this is not someone who was hired to help CeCe win the case. Nor was Dr. Florell, a psychologist, who was a treater, not hired to help CeCe win the case. And what did they say after their repeated consultations with CeCe? Dr. Florell said he sees no limits in her ability to parent, provided she continues to get therapy, which she has responsibly for 20 years. Dr. Avelita, what did he say? No concerns about CeCe's ability to parent, provided she continues to seek therapy, which she has. The expert medical witness on this issue, which demands and requires expert medical testimony, the expert for Wally, is Dr. Bay. When you get to Dr. Bay's testimony, and I think it's so significant here, I'm going to quote it. Dr. Bay was asked about this issue and whether bipolar disorder, as CeCe encountered it, negatively affected her ability to parent. This is what Dr. Bay said. I don't really give many opinions about parenting. And two times during my practice, which has been a long time now, I advise people not to have children. They both went ahead and had kids, and I think they turned out all right. So I don't think I have the expertise to tell somebody about parenting. I'm not sure why. I mean no disrespect to Dr. Bay when I say this. I think in that respect he was being very candid. He's got no opinion about CeCe's or anybody else's ability to parent with a bipolar disorder. Respectfully, I don't believe Dr. Bay's opinion on the matter should have been weighed at all. He doesn't have one. And Dr. Bay was someone that was hired for this case to help Wally win this case. Your honors have seen in the record, he was hired twice. During the first case, when he had a different and more benign opinion toward CeCe, and then in the later case in which Judge Butler entered his order, he had a different opinion, more negative toward CeCe. But he was hired to help someone win a case, not a treater. And even at that, when it all funnels down to the issue that the law cares about, does it affect her ability to parent, he says, I have no opinion. Respectfully, Dr. Bay's opinion, which plainly Judge Butler took into account and cited twice in his honors opinion, should not have counted. And when we talk about what the manifest weight of the evidence is, what the only weight of the evidence is on the issue of what the doctors have to say about whether CeCe's bipolar disorder negatively affects her ability to parent, it's two treaters, not hired gun experts. Two treaters say it does not. The one hired gun expert for the other side says, not a treater. Hired to win a case says, I have no opinion. Furthermore. Let me ask, Mr. Towns, I thought that the court was basing more of its decision on the fact that they were unable to agree on certain issues and cooperate as joint custodians. What I understood the order, Your Honor, to say with regard to joint custody. First, I understood the court to say that based on Judge Butler's consideration of these two factors, stability and CeCe's mental health, that if sole custody were to be awarded, it would have to be awarded to Wally. When the court considered briefly whether joint custody was appropriate, the court said no, because the court didn't perceive that the two parties could get along on the issues of schooling and religion. Now, respectfully on those two issues, I think when you look at the entirety of the record, what does the issue of the matter of schooling and disagreements over schooling boil down to? Something called a Friday folder. Catherine's Friday folder that was sent home with her on schools every Friday and whether or not Wally got it in a timely manner. I think the evidence is clear in the record that that issue was resolved. Now, with regard to the other issue, which Judge Butler found was a reason, one of two reasons why joint parenting was not appropriate here, was the matter of religion. The earlier agreement by CeCe and Wally to raise the children Catholic, and more recently Wally's introducing the children to the religion that he grew up with, Lutheran. Obviously, I would make no criticism of either religion here, but this should not be something. I mean, if this court were to ever get to the point where it was considering whether joint custody is appropriate or whether it was error for Judge Butler to say that disagreements, not at all uncommon, over the religion under which children should be raised disqualify these children from having their parents have joint custody, I believe clearly that's error. His Honor had the right under the law, as does this panel, to say, to order, who will make the decisions about religion under a joint parenting agreement if Your Honors believe that's appropriate. This should not be disqualifying. Minor disagreements over things that couples disagree with routinely should not be something that disqualifies them from joint custody. So Your Honor, what I believe, the way I read Judge Butler's order is he was saying CeCe should not be a sole custodian because the stability factor favors Wally and because the mental health factor favors Wally. Those two, we believe, are plainly in error, contradicted not only by the things Judge Butler is saying in other parts of his order, but also contradicted by the evidence that's been recited for the court. Now, beyond that, when we get to the issue of whether a joint custody arrangement is appropriate, we don't believe under the facts here that when we look carefully at the facts, anyone could say that Friday folders and relatively mild disagreements over religion should be disqualifying. And the court can take care of that with an order. One parent or the other gets to make the call. Your Honors are well aware of that. Now, on the subject of bipolar disorder, in a few minutes we're going to hear, if we hear what was in the brief, we're going to see an effort to characterize this bipolar disorder and to have Your Honors believe that because she has this, she contends with this illness, CeCe is somehow unqualified. An effort to demonize, to make her look like a monster who can't keep a home, who can't care for children, who is erratic, who can't be trusted as a parent. As Your Honors read those things and hear those things, please consider what all of the things that Judge Butler himself said, how the children have thrived under CeCe, time after time after time after time, even in the bottom line of his order. Wally and CeCe should be guided by the court's expectation that respondent will have frequent parenting time with the children and should be allowed to participate in their school and extracurricular activities. It would be a significant loss to the children if her, meaning CeCe's, involvement in their activities is drastically diminished. She's not a monster. She's not a demon. She's someone with a disorder many people suffer with. She's dealing with it as responsibly as she can. She has a track record with these two young human beings that says she loves them, she cares, they have thrived under her care. Respectfully, no facts here justify her being deprived of any custody whatsoever of her children. Once again, we're very grateful for your time. I look forward to being up here again in a few weeks. Thank you, Mr. Collins. Ms. McGrath. Thank you, Your Honor. Good morning, Your Honors. Counsel, may I please the court. Your Honors, with all due respect, we are not here to demonize CeCelia. I think the record demonstrates Walter made many efforts to assist in her care. We are here, as we all know, to determine what is in Catherine and Paul's best interest and which environment, which party the evidence demonstrated provided the most stable environment. The evidence demonstrated Walter's been employed at State Farm for 20 years. Judge Butler recognized, and there was testimony, that he was an active parent throughout the children's life. What about Mr. Collins' argument that there's an error, that the judge found that your client was the primary caretaker, and that was not true? Well, Your Honor, and Walter can see it even in the testimony in the hearings, that CeCelia was the primary caretaker up until the divorce proceedings were filed. Now, from that time forward, by agreement of the parties, Walter agreed to allow CeCelia back in the marital home from 7 a.m. to 8 a.m. to care for the children. She did come in, she made sure the children got to school, and then when the children returned from school at, what would it be, 3, 3.30, she was there to pick them up from school. She was to leave the marital home by 4.30 each day. Now, there was testimony by a number of people about difficulties with that arrangement, with having CeCelia leave on time, but it would be our contention that she was not the primary caretaker from June of 07 through the proceedings. Even if she were the primary caretaker, Your Honors, and I'm sure the court is aware, that is not the dispositive factor in determining what is in Catherine and Paul's best interest. Again, as I indicated to the court, the guardian ad litem and numerous witnesses, even witnesses called by CeCelia, agreed that since the children had been in Walter's care, the children seemed happy, the children were thriving, the teachers testified they were doing well in school. And so when we look to... Were they not doing just as well before when they were in her custody? Well, Judge, if you look to the state of the house when CeCelia was the primary caretaker, and again, with all due respect, I'm not saying, and Walter agreed it was partially his responsibility, but these people agreed that he was the primary breadwinner, CeCelia stayed home. And if you look at the photographs submitted in our brief, we're not just talking about a messy house, we are talking about conditions which ultimately actually caused safety concerns, particularly for Paul when he was in her primary care. Walter testified about an incident which actually happened shortly before Walter decided that he had to file for divorce a second time for the children's sake, when he came home and there was a burnt pan on the stove from macaroni. There was another incident when he came home and Paul had been... He found Paul in the garage in the van on a very hot day with the windows all closed, and CeCelia couldn't tell him how long Paul had been there. Those are safety concerns for the children. There were times when Mr. Tuhart would come home... Well, on one occasion, your honors, CeCelia couldn't find Paul in the home and called 911, and the police had to come to the home and they found Paul behind a curtain. Again, I am not... How old was Paul at the time of the two incidents with the van and the curtain? Judge, the van incident... I'm sorry, give me one moment. I believe the van incident would have been, Judge, he would have been... He was born in 2001, so I believe he would have been three or four. Also, while the children were in CeCelia's care, while the proceedings were pending, the guardian ad litem testified and Judge Butler recognized that the children were taken to school late on occasions. They arrived at school without their school assignments on occasions. While the proceedings were pending, CeCelia had lost her wallet, checkbook, children's report cards, children's... I'm sorry, her cell phone, as well as her car keys. With all due respect to counsel, I believe the seven-page letter of opinion written by Judge Butler certainly is detailed, certainly gave CeCelia credit for being the primary care provider at page three of that letter of opinion. He even recognizes the extraordinary number of activities she had the children participating in. As of 2007, when Walter decided for the children's sake he had to file for divorce again, there was evidence that CeCelia was not taking her medication regularly. There's testimony about her not sleeping, moving furniture around in the middle of the night. Your Honors, I provided to the court in the appendix photographs of the, again, the state of the house under CeCelia's care, and those are in the appendix at pages 114-132, and the state of the house under Walter's care, and those are at the appendix pages 136-143. There are also photographs, Your Honors, of the state of CeCelia's vehicle that she transported the children in. It's not just a messy vehicle. I asked the court to review what that evidence is. As of 2007, CeCelia accused Walter of trying to kill she and the children by fumes from his motorcycle that was parked in the garage. She put a patio set into a bedroom, removed the children's mattresses and put them on the floor. On numerous occasions she refused to leave the marital home when she was supposed to. There was testimony that at times she did not give Paul his nebulizer treatment. She also, in that year and leading up to the divorce, put a desk in a closet. We're not blaming CeCelia for her medical condition. We are saying that because of her periodic inability, perhaps, or unwillingness to take her medications, as Dr. Bay indicated, there was a likelihood of future difficulties. The likelihood was great that there would be future difficulties because CeCelia did not recognize the extent of her illness or the seriousness of her symptoms. And in fact, Dr. Potiat, who was called by CeCelia, did not disagree with that statement. All of the doctors agreed that the important question was whether CeCelia would be able to recognize when her illness was affecting her ability to parent the children. And all of the doctors agreed with that statement by Dr. Bay. Neither of CeCelia's doctors, Potiat or Floreal, provided an answer to that. They agreed that was an important question. Judge Butler indicated that CeCelia's disorder caused difficulties in her managing daily tasks. I think the photographs in the appendix support that conclusion by Judge Butler. I think Judge Butler very carefully recognized both of these parents as sincere and loving parents toward their children. But when looking to which environment was the most stable, don't believe there is any doubt that Judge Butler's decision was unreasonable or not based on evidence. What is the current visitation schedule? Very liberal, Judge. Currently, CeCelia has the children every other weekend, Monday overnight, I believe every other week. And when she doesn't have them on Monday every other night, she has them on Wednesdays, not an overnight, but Wednesdays, I think 5 o'clock to 8 o'clock. The holiday schedule, the children's off-school time is split evenly. And so there is a very liberal visitation schedule. As to Judge Butler's decision not to grant joint parenting... Did you object to joint parenting at the trial court? No one asked for joint parenting, Judge. Neither party sought joint parenting. The Guardian-Ad Litem recommended joint parenting, but as Judge Butler observed in his letter of opinion, really the Guardian-Ad Litem's recommendation for joint parenting would have only been by title, because she was still recommending that Mr. Tuhart retain the decision-making as to religion, education, medical needs. And so that is why Judge Butler indicated it would only be by title, and there was... So if you refer to her as CeCe, if she did not request joint custody before the trial court, have they forfeited that issue? Judge, I believe the trial court on its own could have granted joint parenting, but because of the evidence he, Judge Butler, had considered, he determined that that was not an appropriate arrangement, and as this court knows... I'm saying, have they forfeited on appeal? They requested that as an alternative relief. Well, Judge, they did not seek it in their motion to reconsider with Judge Butler. Arguably they have. Arguably they have. But they did not seek it either at the trial court or in the motion to reconsider. And just a few more comments about a joint parenting arrangement. There was evidence, not only... CeCelia wasn't... There's testimony she wasn't leaving the house on time. There were broken things in the marital home while she was present, whether she broke them or someone else broke them, one of the children broke them. There were disagreements about school assignments. And the saddest thing, a few of the saddest, or some of the sadder issues, is they couldn't even agree... CeCelia had a birthday party for Catherine, didn't invite Paul. Then they tried to work up an arrangement where they were going to have... I'm sorry, didn't invite Walter. And then they tried to work an arrangement where they were going to have a joint birthday party for Paul, and then CeCelia didn't show up at that. So, as this court knows, joint parenting requires extraordinary communication, and I don't believe the record in this case supports an award of joint parenting. Unless the court has other questions, I would ask that you affirm Judge Butler's decision. Thank you. I appreciate that. Your Honor, thank you. When we ask what I think is a fundamental and important question, who did the petitioner, Wally, entrust to be the primary caregiver of his children, of his and CeCelia's children, for the first ten years of Catherine's life, for the first seven years of Paul's life? Not only up to June of 07, when the divorce proceeding began, but even afterwards through the joint parenting agreement. Who did Wally say, who did Wally trust to be the primary caregiver of his two children, CeCelia? The record is clear, it is undisputed, that's what Wally thought. Do you believe that the evidence showed any deterioration in your client's condition? I do not at all, Judge, and I think it's also clear in His Honor Judge Butler's order. As His Honor said, during the period of the joint parenting agreement, the children thrived. When we look at my client's condition as it bears on the most significant issue here in this courtroom, which is the best interest of the children, Judge Butler's order, these children thrived. They did very well. We don't disagree with that at all. Our only bone of contention is, CeCelia was the primary caregiver. I don't think you heard much argument from counsel on this point. When you work through the nuts and bolts of the party's agreement, operative since June of 07, CeCelia was the primary caregiver. She had the most time with these kids. She did the heavy lifting of the parenting, schooling and everything else. Am I misunderstanding the arrangement? I thought there was an hour in the morning and an hour in the afternoon that your client was with the children and that he had the children the rest of the time. First of all, it's much, much more than that. If you're talking about just during the school year, there were two summers involved here, too, where it was nine and a half hours each day. Even if you're talking about the school period, we're talking about not just the time, but also the work of parenting. Getting the kids out of bed, getting them fed, getting them off to school, participating heavily in school activities. As his honor order says, she was involved in, Judge Butler's term, an extraordinary number of activities for these children. Arranging play dates, picking them up from school, bringing them home. It was at least a couple of hours at the end of the day. As counsel even said, sometimes it was difficult to get Cece to leave. I'm not saying that's okay, especially when you're dealing with a court order, but I think it is reflective of the fact that she loved her kids, she wanted to be with them, and they wanted to be with her. It was more than just an hour at the beginning and the end of each day. It was also alternate weekends, same as Wally, and it was also alternate Monday nights during the school year. When you get to the summer, and there were two summers involved, the summer of 07, most of it, and all of the summer of 08. There was nine and a half hours each day, Monday through Friday, where this order was operating. And during the summer, did she have the children every other weekend as well? Yes. As did Wally, and then every other Monday night. Now, your honors are referred to, I stopped counting the number of times your honors were invited to look at the pictures. Pictures, the pictures, the pictures of the messy home. The pictures. Two important things I want to say. In Judge Butler's order, however, it is evident in the comments of friends, family, and litigant interviews that Mr. Tupac also played a large role in raising the children and helping to keep the home running. So Mr. Tupac is credited by his honor Judge Butler with helping to keep the home running. So think about this now. Seeing messiness in his home, which is alleged before your honors and at the trial court, but to have endured relentlessly in his home that he was charged with keeping running, rather than clean it up, he chose to take pictures to win a case and to seek to deprive his wife of the only role she'd known with her children, primary caregiver to those children. If he had responsibility too, he should have cleaned it up. He had just as much obligation as she did to clean it up. And as I heard the frequent recitation to the pictures, and the messy car, and children late to school, and coming without assignments, and lost wallet, and cell phone, and keys, I'm thinking there but for the grace of God go I. Hopefully I and my wife never get measured in a courtroom against that standard. This is parenting. It's messy. It's not perfect. That brings me back to the most important point. You would think, you would hope, that if these messy pictures singularly attributed to CeCe, and the messy car singularly attributed to her, and children late to school, and lost keys, and everything else singularly attributed to CeCe, you would think that if that so obviously disqualified her as a custodial parent, they could find somebody to say so. They could bring an expert into court, a hired gun like Dr. Bay, to plainly say so. But when we got to the bottom line of Dr. Bay, he couldn't and wouldn't say it. He doesn't offer opinions on parenting. The question before your honors is not whether the home was messy, whether the car was messy, whether the keys were lost, whether the children were occasionally late for school. The question is whether any of that and anything else funneled down to CeCe being an unfit parent. No one. No one. It's not an issue of unfitness. It's the best interests of the children. Thank you, Your Honor, and of course you're right. On this point where I'm alleging error, when His Honor talked about the stability of the home, and particularly talked about whether CeCe's bipolar disorder is a factor that weighs against her, I'm saying, how could it? We're talking about a matter of science, and they couldn't find a scientist, even an expert, a scientist hired to help win a case. They couldn't find one to say these things mean her bipolar presents a danger to the kids, means she's unable to parent, even diminishes her ability to parent. They couldn't find anyone to say that. So I beg this on this most important matter, please don't look at pictures, or as you look at pictures, as you look at arguments about whether messy cars and homes and kids late for school and without their homework should count to deprive CeCe of the only role she had ever known regarding these kids up until October of 08, please consider they couldn't find any scientist to say so. They couldn't find a doctor to say so. Thank you.